(80 South. 821)
WINFIELD LUMBER CO. v. PARTRIDGE.
(7 Div. 923.)

(Supreme Court of Alabama. Dec. 19, 1918. Rehearing Denied Feb. 13, 1919.)

1. LOGS AND LOGGING ⊝3(13) — STUMPAGE LIEN.
Code 1907, § 4814, creates a lien on lumber made from timber sold.

2. CONTRACTS ⊝212(2)—TO FURNISH TIMBER LANDS.
Where a contract to obtain timber land for another does not specify any time for doing so, there is a law-implied reasonable time in which to do so.

3. CONTRACTS ⊝173 — BREACH — CONDITION PRECEDENT.
In sale of timber lands, where vendor, in consideration of striking guaranty of certain amount of lumber to be had off certain land, agreed to get vendee 200 acres more of timber, vendee to have 60 days to look over and investigate same, vendee was not required, as condition to right to implead vendor for breach of his promise, to demand performance of agreement or to offer to complete purchase thereof, or to offer or to avow a readiness or ability to buy the 200 acres; the breach occurring in vendor's failure to tender land for investigation within a reasonable time.

4. CONTRACTS ⊝337(5)—BREACH—PLEADING.
Where vendor of timber lands, in consideration of certain changes in contract, agreed to get vendee 200 acres more of timber lands, vendee to have 60 days in which to investigate title, etc., vendee, in setting up breach of promise to tender 200 acres, must allege, not only that tender was not made, but that it was not made within a reasonable time.

5. TRIAL ⊝145 — PLEADING AND ISSUES — WITHDRAWAL OF ISSUES.
In action on note, where plaintiff set up that he was a bona fide purchaser, issue of bona fide purchaser was in effect withdrawn by a declaration of plaintiff's attorney on trial to effect that plaintiff knew all about the business, and that he withdrew "that innocent purchaser business."

6. CONTRACTS ⊝9(1)—VALIDITY.
An agreement to "get" for a certain person 200 acres of timber land, and offer it for such other person's investigation, etc., was not void.

Appeal from Circuit Court, Talladega County; Hugh D. Merrill, Judge.

Action by E. R. Partridge against the Winfield Lumber Company. Judgment for plain-

tiff, and defendant appeals. Reversed and remanded.

Knox, Acker, Dixon & Sims, of Talladega, for appellant.

Riddle & Riddle, of Talladega, for appellee.

McCLELLAN, J. The plaintiff (appellee) was the transferee, for value, before maturity, of three negotiable notes (of a series) executed by the defendant (appellant) to W. E. Headley. Two suits were brought thereon, being begun by attachment under the authority of Code, § 4814, wherein a "stumpage" lien is provided and the means for its enforcement prescribed. Under the authority of Code, § 5358, the actions were properly consolidated. The affidavits on which the writs of attachment were issued bore the affirmation that these notes were given for the purchase price of timber, and claimed the securing lien upon this timber and the lumber produced by its manufacture. The recitals of the affidavits did not disclose whether all, or only a part, or the timber had been converted into lumber. There was no evidence tending to show whether any or all of the timber had been converted into lumber. The defendant filed its motion to quash the writ and to dismiss the cause, because the statute (Code, § 4814) gives the lien on *timber* and not *lumber*. The return on the writs recited the execution of the processes by levies on the property described in the writs, which, in turn, followed the description in the affidavits. So far as presently important, Code, § 4814, reads:

"Owners of land, or their assignees, shall have a lien upon timber sold therefrom for purposes of rafting, shipping, or manufacture, for the stipulated price or value thereof, commonly known as stumpage."

[1] In Thornton v. Dwight Mfg. Co., 137 Ala. 211, 214, 34 South. 187, this court accepted the statute (now section 4814) as imposing the lien on lumber produced by the manufacture of timber sold by the owner. The later decisions in Slight v. Frix, 165 Ala. 230, 51 South. 601, and Craze v. Ala. Land Co., 155 Ala. 431, 46 South. 479, did not involve or decide the question of construction of the statute sought to be raised by this appellant's motion to quash. The inquiry in Slight v. Frix was whether a variance in pleading had intervened. In Craze v. Ala. Land Co. the action was in trover, and did not invite the construction of this statute. There may be, of course, occasions where the terms "timber" and "lumber" must be accorded different meanings. 25 Cyc. pp. 1545, 1546. This is not one of them. It is not reasonably conceivable that the lien the statute intended to create should become extinct when the timber sold by the owner has been converted by the purchaser into lumber, and no rights of innocent third parties have attached to the manufactured product. Indeed, if the lien only extended to the timber, it may be that as against the owner or his assignee the purchaser from the owner would be estopped to assert his conversion of the timber into lumber to the exoneration of the timber from the lien the statute (section 4814) prescribes.

Having under consideration a Wisconsin statute providing a laborer's lien on logs and timber for labor performed in manufacturing the logs and timber into lumber, it was held in Gross v. Eiden, 53 Wis. 543, 548, 11 N. W. 9 (cited to support the text in section 726 of 1 Jones on Liens), that the discriminating terms ("timber" and "lumber") employed in the statute resulted in such a contradiction in terms as to prevent the imposition of the lien upon the lumber, the product of the laborer's effort. If it is assumed that the Wisconsin and the Alabama (section 4814) statutes have some features in common, it is plain that the considerations inducing the nullifying ruling made in Gross v. Eiden, supra, are not factors in the construction of our statute. The result of the view accepted by that court was to deny, quite anomalously, the laborer the benefit of the lien because the labor performed by the laborer on the "logs or timber" wrought a change of the "logs or timber" into lumber by the very service the compensation for which the lien was intended to afford security. We cannot accord the ruling in Gross v. Eiden any influence in the construction of our statute.

The appellant (defendant) and Headley negotiated a trade whereby the latter was to sell to the former the timber on certain tracts of land in Talladega county. Among these timbered lands was some belonging to the Alabama Mineral Land Company. The vendor (Headley) did not acquire the right to the timber land belonging to the Alabama Mineral Land Company. It was omitted from the deed from Headley to the appellant. As originally drawn, the deed contained a "guaranty" that the timber conveyed would cut 5,000,000 feet. This provision was stricken from the deed. On the 8th day of June, 1916, the deed from Headley to the appellant was executed. Headley gave the representative of the appellant a paper, addressed to the appellant and signed by Headley, which read:

"In closing our deal for lumber this morning in consideration of your withdrawing clause for 5,000,000 feet guaranty, I have this substitute guaranty: I will get you 200 acres more of timber, and give you 60 days to look over and investigate same, cruise, estimate, examine title, etc., this to be sold you for $5 per acre and same trade in proportion as the deal we are closing to-day. In addition to this I guarantee that this additional 200 acres and the Parks land will cut twice as much timber as on lands left out of original deal on account of failure to secure deeds to Alabama Mineral Land Company lands. However, should this fail to fur-

nish this amount of timber I am to have right to buy and furnish balance from adjacent land."

The evidence was in conflict upon the issue whether the quoted paper was executed as a part of the then unconsummated transaction for the purchase of the timber, or was an engagement undertaken after the transaction had become consummated, and, according to the plaintiff's contention, was without consideration, not binding Headley. The court submitted the determination of this issue of fact to the jury. Whether the terms of the writing, even though regarded as distinct from the transaction evidenced by the deed dated June 8, 1916, imposed, when accepted by the defendant, mutual obligations on both the parties, is a question not now presented for decision. A number of pleas were filed wherein the defendant (appellant) sought to avert a recovery on the notes in consequence of its interpretation of the engagements stated in the quoted paper which, it was averred, were a part of the consideration for the notes declared on; the allegation being that Headley failed or refused to perform the obligations therein assumed by him. The only errors assigned that bring into question the rulings of the court on the pleadings refer to the action of the court in sustaining demurrers to original pleas 4 to 9, inclusive.

[2-4] If the obligations imported by the writing dated June 8, 1916, and the notes sued on became and were a part of the single transaction consummated by the delivery of deed from Headley to the defendant, as the defendant avers in its original pleas and avows in its evidence, the contract in question was supported by a consideration. In the original pleas the writing was appropriately incorporated. According to the writing of June 8, 1916, Headley gave the defendant "guaranties." The term "guaranty" was there intended to mean—was synonymous with—promise. Deeves v. Manhattan Ins. Co., 195 N. Y. 324, 88 N. E. 395. The primary promise therein stated was that Headley should get for the vendee 200 acres more of timber land as a "substitute" for the vendee's withdrawal of the clause "for 5,000,000 feet;" whereupon the vendee was granted 60 days in which to investigate, cruise, estimate, and examine title to the 200 acres the vendor engaged to "get" for the vendee—this with the evident purpose to enable the vendee to determine whether it would take the 200 acres of timber land to be secured by the vendor at the price and on the terms prescribed in the writing of June 8, 1916, the vendor giving the further assurance, dependent, of course, upon the securing by the vendor of the 200 acres, that the 200 acres, and the Parks land would "cut" twice as much timber as the omitted Mineral Company's timber land, failing which the vendor reserved the right to supply the deficiency from other sources. If otherwise binding upon the vendor, the initial primary obligation assumed by the vendor was to "get" the 200 acres, and to submit it to the investigation, etc., of the vendee. No time being specified, the vendor had a law-implied reasonable time from June 8, 1916, in which to submit the 200 acres to the investigation, etc., of the vendee. The vendor's obligation to tender the 200 acres to the vendee's scrutiny was precedent to any obligation on the part of the vendee to buy it on the terms stipulated in the writing of June 8, 1916; and hence the vendee was not required—as a condition to a right to implead the vendor for a breach of his promise to tender the 200 acres of timber land to the vendee—to demand performance of this agreement by the vendor or to offer to complete the purchase thereof or to offer or to avow a readiness and ability to buy the 200 acres the vendor engaged to "get" for the vendee. Fulenwider v. Rowen, 136 Ala. 287, 307–309, 34 South. 975; 39 Cyc. pp. 1305–1308.

The application to the agreement evidenced by the writing of June 8, 1916, of the sound, pertinent principles restated in the Rowan Case, requires the conclusion that Headley's obligation to "get" the 200 acres for the vendee was independent, was precedent to any obligation on the vendee to make demand on Headley for the 200 acres or to avow willingness and ability to perform the subsequent obligations assumed by the vendee, provided, of course, the vendee accepted the promise set forth in the writing of June 8, 1916. Since pleas 5, 8, and 9 (incorporating therein the writing of June 8, 1916) proceeded on a theory that involved an avowal by the defendant that Headley did not acquire or offer the 200 acres he had engaged to "get" for the defendant—which in its order was an essential condition to Headley's promise with respect to the comparative quantity of timber the 200 acres and the Parks land would "cut"—original pleas 5, 8, and 9 were stricken on demurrer without prejudicial error to the defendant appellant. Under the pleading and evidence the only possible breach of the obligations imposed on Headley by the writing of June 8, 1916, was his failure, within a reasonable time, to tender the 200 acres of timber land he engaged to "get" for the vendee.

Original pleas 4, 6, and 7 undertook to assert the breach by Headley of his primary obligation to tender the vendee the 200 acres of timber land stipulated in the writing of June 8, 1916. Apart from other considerations touching the sufficiency of these original pleas, they were defective in the particular that they did not aver Headley's failure to tender the 200 acres of timber land, as stipulated in the writing of June 8, 1916, within a reasonable time after that date. The twenty-

seventh and twenty-eighth grounds of the several demurrers to these original pleas (4, 6, and 7) justified the court in sustaining the respective demurrers to each of them.

At the instance of the plaintiff the court gave this instruction to the jury:

"The court charges the jury that before Headley can be said to have breached his contract to furnish the 200 acres additional timber, the plaintiff [meaning defendant] would have to call on him for the 200 acres and comply or offer to comply with his contract."

In view of the proper construction of the writing of June 8, 1916, it was error to so instruct the jury. This instruction proceeded on .the incorrect theory that Headley's obligation to "get" the 200 acres of timber was dependent, within the doctrine of Elliott v. Howison, 146 Ala. 568, 40 South. 1018, among others in that line; that the vendee was obliged by the agreement to call for performance by Headley and at least avow willingness and ability to perform on the vendee's part; whereas, until Headley offered the vendee the 200 acres there was no obligation on the vendee to do anything, the vendor's offer, when made, being efficient to put in operation the 60-day period during ·which the vendee should investigate, etc., the timber land so tendered.

[5] The plaintiff set up that he was a bona fide purchaser of the notes declared on, for value without notice. When the defendant introduced showings for the absent witnesses Chasteen and Messer, this appears from the recitals of the·bill of ·exceptions:

"Mr. Dixon: We offer these two showings here now.
"Mr. Riddle (for the plaintiff) stated: There are a whole lot of objections to them. I believe· I will relieve him; I will just state that Partridge knows all about it.. I withdraw that innocent purchaser business.
"Mr. Dixon: That he is a party to it.
"Mr. Riddle: Yes; just treat it as if the transaction was made with Partridge.
"Mr. Dixon: That he is a partner in the business.
"Mr. Riddle: No, sir.
"Mr. Dixon: That's what these showings are.
"Mr. Riddle: I just withdraw it.
"Mr. Dixon: What we want to know is if he objects to the showing.
"The Court: On what grounds do you object to it?
"Mr. Riddle: I don't believe that two-thirds of it is legal, but I will let him go and offer it all."

The result was, in effect, to withdraw the issue of bona fide purchaser. Since the evidence did not establish a contract relating to the 200 acres of additional timber land that was susceptible of breach by the defendant in failing to pay at maturity the notes referred to in the pleas, it cannot be affirmed that the plaintiff conclusively proved his replica-

tion numbered 7—this to the argued end that no error of prejudice to appellant intervened.

[6] It is hardly necessary to add that the agreement evidenced by the writing of June 8, 1916, whether considered alone or as a part of the transaction culminating in the deed from Headley to appellant, was not void in the particular that it obliged Headley to "get" for appellant 200 acres of timber land and offer it for appellant's investigation, etc.

For the errors indicated, the judgment is reversed, and the cause is remanded.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.